IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,
    Plaintiff,

vs.          No. 18-CV-561 JCH/LF

$68,790.00 in U.S. currency,
    Defendant.

HEATHER STEWART,
    Claimant.

## CLAIMANT HEATHER STEWART'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS AND MEMORANDUM IN SUPPORT THEREOF

COMES NOW, Heather Stewart, by and through her counsel of record, Erlinda O. Johnson, Esq., and hereby respectfully moves this Court for an order suppressing all evidence seized from her person and her personal belongings on February 5, 2018. As grounds, Claimant Stewart submits the following memorandum brief:

## INTRODUCTION

According to the investigative reports in the above captioned cause, on February 5, 2018, agents with the Drug Enforcement Administration (DEA) were working at the Amtrak Train Station in Albuquerque, New Mexico. Prior to the arrival of Amtrak train number 3 from Chicago, Illinois to Los Angeles, California, DEA Agent Jarrell Perry reviewed the Amtrak train's passenger manifest or name record. Agent Perry reviewed

a reservation for passenger Heather Stewart. Agent Perry noted that Ms. Stewart was traveling one-way from Chicago to Los Angeles on a ticket that had been purchased with a visa card at the Chicago Amtrak train station on February 4, 2018.

Upon the arrival of Amtrak Train number 3 in Albuquerque, New Mexico, DEA Agent Perry and DEA Task Force Officer S. Chavez boarded the train's Sleeper car 340. Agent Perry and Task Force Officer (TFO) Chavez approached bedroom number 18 and observed Heather Stewart walking in the hallway towards the area where Agent Perry was standing. Agent Perry greeted Ms. Stewart by saying, "how are you doing ma'am?" Ms. Stewart responded, "hi." Agent Perry introduced himself to Ms. Stewart. According to the recording of this first encounter between Agent Perry and Ms. Stewart, Agent Perry asked her if he could speak with her. Ms. Stewart agreed and Agent Perry began to ask her questions about her travel. Agent Perry then asked Ms. Stewart about her luggage by stating,

> Okay. All right. Would you-, could you show me your luggage that you have with you, ma'am?

Ms. Stewart responded, "[w]e can go look at it." After entering Ms. Stewart's sleeper room, Agent Perry continued to question Ms. Stewart about her luggage as follows,

AGENT PERRY: And this is the only bag you have in here or is there another one?
H. STEWART: And there's this one.
AGENT PERRY: Okay. Okay. And would you consent for a search of your bags for contraband, ma'am?
H. STEWART: Well, I could consent but it's kind of pointless. How many bags have you searched since you got on the train?
AGENT PERRY: Well, ma'am, the train just came in and we're going to be on all the cars

2

| | |
|---|---|
| | talking to as many people as we can. |
| H. STEWART: | And when you say search, you just want to look in them? |
| AGENT PERRY: | Yes, ma'am. |
| H. STEWART: | Okay. I mean, it's not like you're going to dig through it, right? There's nothing really. |
| AGENT PERRY: | But you don't have any weapons or anything in there? |
| H. STEWART: | No. I don't have any-, I don't have anything anyway. |
| AGENT PERRY: | Okay. |

Agent Perry searched Ms. Stewart's luggage without clarifying if he would allow her to go through the bags. After searching Ms. Stewart's luggage and not finding anything illegal, Agent Perry asked Ms. Stewart if he could search her room. Ms. Stewart declined by stating, "[i]t's not that I won't-. I'm-, I've been cooperative. Be ho-, I've been cooperative. Let's-, you might as well move on. It was-, I only have so much time. I just want to go take a little walk." At that point, the encounter with Ms. Stewart terminated.

Agent Perry thereafter seemed to continue his encounters with other passengers. While he was encountering two women, Ms. Stewart approached Agent Perry and asked to look at his credentials. The following brief exchange took place,

| | |
|---|---|
| H. STEWART: | Hi. |
| AGENT PERRY: | How are you doing, ma'am? |
| H. STEWART: | Can I see your credentials, please? |
| AGENT PERRY: | Yes, you can. I was talking to her and I'll talk to you in just a minute, if that's okay. |
| H. STEWART: | **No, no. We've already talked.** I just want to see. |

Ms. Stewart walked away and Agent Perry continued with his encounter with the two other women. After concluding his encounter with the other women, Agent Perry sought out, found Ms. Stewart and re-approached her. What transpired thereafter

resulted in a violation of Ms. Stewart's Constitutional right pursuant to the Fourth Amendment as Agent Perry failed to ask Ms. Stewart if she wished to speak with him but instead quickly launched into accusatory questioning. When Agent Perry re-approached Ms. Stewart, he asked her if she had any questions for him. She clearly and unequivocally told him that she did not have any questions for him and that earlier she had just wanted to see his credentials. Agent Perry immediately launched into a series of accusatory questions,

| | |
|---|---|
| AGENT PERRY: | Okay. Um-, I noticed that you're pretty nervous. Can you tell me why you're nervous? |
| H. STEWART: | I don't think I am nervous. |
| AGENT PERRY: | Really? You were very nervous when I was talking to you up in the room, ma'am. Okay. |
| H. STEWART: | I don't feel like I'm nervous. |
| AGENT PERRY: | Did you buy your train ticket? |
| H. STEWART: | Yeah. |
| AGENT PERRY: | You did? |
| H. STEWART: | Yes. |
| AGENT PERRY: | When did you buy it? |
| H. STEWART: | Yesterday when I got on the train. |
| AGENT PERRY: | Okay. Did you buy it in Chicago or did you do it online or h o w did you do it? |
| H. STEWART: | I bought it in Chicago. |
| AGENT PERRY: | And how far in advance did you purchase your ticket? |
| H. STEWART: | When I got to the train station. |
| AGENT PERRY: | Okay. The purpose to your trip out to Chicago was for what? |
| H. STEWART: | I was doing some business, visiting some friends. Is there a reason why you're asking me these questions? |
| AGENT PERRY: | Yeah, because you're very nervous, ma'am, when I was talking to you that's why I'm asking you more quest– |
| H. STEWART: | Really? |
| AGENT PERRY: | –yes. |
| H. STEWART: | I don't know why you'd say that. |
| AGENT PERRY: | And your travel method is very odd. |

4

| | |
|---|---|
| H. STEWART: | Is it? |
| AGENT PERRY: | Yes. Can you tell me why you flew out there and now you're taking a train back? |
| H. STEWART: | No, I can't. |
| AGENT PERRY: | Okay. |
| H. STEWART: | I just don't see why that's even an issue. I've shown y o u everything you want to see– |
| AGENT PERRY: | No, you haven't, ma'am– |
| H. STEWART: | I– |

Without pausing, Agent Perry continued to question Ms. Stewart. He went on to demand to know if she had another bag in her room. Ms. Stewart stated that she did have another bag in her room. Agent Perry then directed Ms. Stewart to show him the bag in her room by stating, "can you show me your bag in your room?" Ms. Stewart reluctantly stated, "yeah." Agent Perry then escorted Ms. Stewart back to her room. While they were walking back to Ms. Stewart's room, Agent Perry continued asking Ms. Stewart questions about her travels and accusing her of being nervous. Ms. Stewart told Agent Perry that she was not nervous. Once in her room, Ms. Stewart showed Agent Perry the third piece of luggage. Agent Perry opened the third piece of luggage and therein found some gift-wrapped bundles which contained the cash that Agent Perry seized.

## ARGUMENT

*The Second Search of Ms. Stewart's Luggage was the Result of an Unlawful Seizure And therefore, the Fruits Thereof Must be Suppressed*

A motion to suppress evidence in this case is appropriate because the Fourth Amendment's exclusionary rule extends to civil forfeiture proceedings. *See One 1958 Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 696, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965);

5

*United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida,* 363 F.3d 1099 (11th Cir.2004) (claimant in civil forfeiture proceeding filed motion to suppress **evidence** obtained during search of house); *See also United States v. 4,432 Mastercases of Cigarettes,* 2006 WL 1511773 (9th Cir.2006) (civil forfeiture claimant filed motion to suppress cigarettes seized during search of storage area conducted without a warrant); *United States v. $99,990 in United States Currency,* No. 01-5685, 2003 WL 21698849 (6th Cir. July 17, 2003) (unpublished opinion) (civil forfeiture claimant filed motion to suppress challenging searches of motel room and car resulting in seizures of currency).

The Fourth Amendment of the United States Constitution protects citizens from "unreasonable searches and seizures" conducted by government officials. U.S. Const. Amend. IV; *Mapp v. Ohio,* 367 U.S. 643, 655 (1961). In applying these Fourth Amendment protections, the Courts have recognized "three categories of police-citizen encounters: (1) consensual encounters which do not implicate the Fourth Amendment; investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause." *United States v. White,* 584 F.3d 935, 944-45 (10th Cir. 2009). "'These categories are not static, and may escalate from one to another.'" *Id.* (*quoting Cortez v. McCauley,* 478 F.3d 1108, 1115 n.5 (10th Cir. 2007) and *United States v. Shareef,* 100 F.3d

1491, 1500 (10th Cir. 1996)).

When the government seeks to rely upon consent to justify a search, the burden of proof that the consent was, in fact, freely and voluntarily given rests with the government. *Wren v. United States*, 352 F.2d 617 (10th Cir. 1965); *United States v. Jones*, 701 F.3d 1300, 1318 (10th Cir. 2012)(citation omitted).

In *Florida v. Bostick,* the Supreme Court deemed the following factors relevant to the determination: (1) whether the agent advised the defendant he had the right to refuse consent, (2) whether the agent in any way threatened the defendant (i.e., the display of a weapon and/or the nature of the questioning), and (3) the particular location of the encounter. *Florida v. Bostick,* 501 U.S. 429, 437 (1991). On the one hand, officers are free to approach citizens and ask a few general questions in an attempt to investigate alleged crimes without violating the Fourth Amendment so long as the entire interaction is consensual. *Id.* at 434. However, on the other hand, there are other cases in which an officer's show of authority, particularly in the cramped confines of a bus or train, may be so intimidating that an individual could reasonably believe that she was not free to disregard the police presence and go about her business. *See id.* at 437. The individual's subjective state of mind may be relevant to some degree on the issue of the voluntariness of his or her consent. *United States v. Zapata*, 997 F.2d 751, 757 (10th Cir.1993); *see also United States v. Huerta-Rodriguez*, 2010 WL 4929044, at *10 (D.N.M. Oct. 20, 2010) (Browning, J.) (citing Hill). It is well established that "[a]ccusatory, persistent,

and intrusive questioning can turn an otherwise voluntary encounter into a coercive one." *United States v. Ringold*, 335 F.3d 1168, 1174 (10th Cir. 2003).

In this case, it is anticipated that the government will argue that the second encounter between DEA Agent Perry, TFO Chavez and Ms. Stewart was consensual. However, the evidence in this case demonstrates that the second encounter between officers and Ms. Stewart was not consensual nor supported by reasonable suspicion. It is evident from the audio recording of the encounter that Ms. Stewart did not wish to continue her conversation with Agent Perry. Nevertheless, the agent pressed on with rapid fire questions about her travel, additional luggage and nervousness. Not once did Agent Perry ask Ms. Stewart if she would be willing to continue speaking with him. The second encounter was a seizure, requiring suppression of evidence obtained therefrom.

Whether a police-citizen encounter amounts to a seizure of the individual which implicates Fourth Amendment protections depends on a consideration of "all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officer's requests." *Florida v. Bostick,* 501 U.S. 429, 439 (1991).

In addressing the standard for determining whether a seizure has occurred, the Tenth Circuit summarized the following:

> [A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that [ ]he was not free to leave." *United States v. Fox*, 600 F.3d 1253, 1258 (10th Cir. 2010) (first

alteration in original) (quoting *United States v. Mendenhall,* 446 U.S. 544, 554 (1980)) (internal quotation marks omitted); *see, e.g., United States v. Salas–Garcia,* 698 F.3d 1242, 1248 (10th Cir. 2012) ("A seizure occurs when 'a reasonable person would not feel free to leave or disregard the contact.'" (quoting *Lundstrom v. Romero,* 616 F.3d 1108, 1119 (10th Cir.2010))). "The critical inquiry is whether the police conduct would have communicated to a reasonable person that [ ]he was not at liberty to ignore the police presence and go about [his] business." *Fox,* 600 F.3d at 1258 (quoting *Bostick,* 501 U.S. at 437, 111 S.Ct. 2382, 115 L.Ed.2d 389) (internal quotation marks omitted).

*United States v. Jones*, 701 F.3d 1300, 1313 (10th Cir. 2012). Importantly, a seizure occurs when the officer conveys a message that compliance with their requests is required. *See United States v. Bostick,* 501 U.S. 429, 437 (1991).

Here, when Agent Perry re-approached Ms. Stewart, he asked her if she had more questions for him. Ms. Stewart told him she did not and had already signaled to Agent Perry that she did not wish to continue speaking with him. That should have ended the encounter. Instead, Agent Perry, accompanied by TFO Chavez, immediately launched into accusatory questions about why Ms. Stewart appeared nervous,

| | |
|---|---|
| AGENT PERRY: | Ma'am? |
| H. STEWART: | Yeah. |
| AGENT PERRY: | Did-, did you have more questions for me? |
| H. STEWART: | **No,** I just– |
| AGENT PERRY: | Okay. |
| H. STEWART: | –wanted to see your ID. |
| AGENT PERRY: | Okay. Um-, I noticed that you're pretty nervous. Can you tell me why you're nervous? |
| H. STEWART: | I don't think I am nervous. |
| AGENT PERRY: | Really? You were very nervous when I was talking to you up in the room, ma'am. Okay. |
| H. STEWART: | I don't feel like I'm nervous. |

Given Agent Perry's tone and persistence, a reasonable person in Ms. Stewart's position

9

would not have felt free to walk away. She had already told Agent Perry she did not have any questions for him. She also had earlier signaled to him that she did not wish to continue speaking with him and that she only wanted to see his credentials. Nevertheless, Agent Perry pressed on with questions about why she seemed nervous to him. The entire second encounter constituted a seizure and therefore any evidence derived therefrom must be suppressed.

While Claimant recognizes that law enforcement officers do not violate the Fourth Amendment by approaching an individual and asking him if she is willing to answer questions, *Florida v. Bostick*, 501 U.S. 429, 434 (1991), the critical distinction here is that on the second encounter Agent Perry did not ask Ms. Stewart if she was willing to speak with him. Quite the contrary, Ms. Stewart clearly told Agent Perry she did not have any questions for him and right before that she had told him, "no, no. We've already talked." Undeterred, Agent Perry sought out Ms. Stewart and began questioning her without first asking if he could speak with her again. Taking into account all of the circumstances surrounding the second encounter, the police conduct would have communicated to a reasonable person that she was not at liberty to ignore the police presence and go about her business. *See id.* at 437.

The already coercive encounter escalated to a completed seizure when Ms. Stewart, surrounded by Agent Perry and TFO Chavez, was directed to go show officers the third piece of luggage and was thereafter escorted back to her sleeper room.

However, what truly marked the second encounter as a seizure and non-consensual was Agent Perry's continued questioning of Ms. Stewart despite the fact that she had terminated the first encounter by: 1) telling him that he needed to move on and that she was done; 2) by later telling Agent Perry when she asked to see his credentials that she did not wish to speak with him again and that she just wanted to see his credentials; and 3) by telling Agent Perry when he re-approached her that she did not have any questions for him. Despite all these messages to Agent Perry that Ms. Stewart did not wish to speak with him again, Agent Perry launched into rapid fire questioning of Ms. Stewart. Indeed, a citizen in Ms. Stewart's position could not have been expected to decline to continue the encounter. *See United States v. Fox*, 600 F.3d 1253, 1258 (10th Cir. 2010)(even where a citizen could have instructed officer to leave her alone, "we do not think that under the circumstances a reasonable person would have felt free to do so.")

In *Fox,* the Tenth Circuit held that a seizure had taken place based upon the display of uniformed authority and instructions, even though "[t]hroughout the encounter, the officers spoke calm, conversational tone with Ms. Chiles. They never displayed their weapons nor did they make any explicit threats or promises." 600 F.3d at 1256. The tone of Agent Perry's questions does nothing to alter the imperative nature of the instructions themselves and no citizen would feel free to ignore them. Accordingly, the second encounter with Ms. Stewart was a seizure.

*Ms. Stewart's Second Encounter was a Seizure which Lacked Reasonable Suspicion.*

A seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing. *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). Law enforcement officers do not have carte blanche to exercise "standardless and unconstrained discretion" in an effort to discover evidence of ordinary criminal wrongdoing. *Id.* at 38. In particular, officers are prevented from establishing unconstitutional, suspicionless check points for the primary purpose of interdicting narcotics. *Id*. at 41-42. Ms. Stewart did not freely and voluntarily consent to questioning by Agent Perry during the second encounter. Instead, under the totality of the circumstances, Ms. Stewart merely acquiesced to Agent Perry's increasing show of authority when he launched into questions about perceived nervousness and her travels. Ms. Stewart submitted to a Claim of Lawful Authority. She respectfully submits that she did not freely and voluntarily consent to Agent Perry's second round of questioning, but instead ultimately submitted to his increasingly assertive show of authority, thereby giving rise to a seizure.

Agent Perry's second encounter with Ms. Stewart cannot, by any stretch of the imagination, be characterized as a consensual encounter. Similarly, it cannot also be justified under any other legal doctrine. A seizure by means of an investigative detention "is constitutional only if supported 'by a reasonable and articulable suspicion that the person seized is engaged in criminal activity.'" *United States v. Ward,* 961 F.2d 1526, 1529

12

(10th Cir.1992) (quoting *Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 2754 (1980) (per curiam)). In determining whether reasonable suspicion exists, "'the totality of the circumstances—the whole picture—must be taken into account. Based upon that whole picture, the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Bloom*, 975 F.2d 1447, 1456 (10th Cir. 1992)(quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 695 (1981)).

In *United States v. Ward,* a case with similar facts to the current case, the Tenth Circuit held that agents lacked reasonable suspicion to detain a train passenger suspected of transporting narcotics. 961 F.2d 1526 (10th Cir.1992). Prior to the defendant's seizure in *Ward,* the agents learned from a previously reliable informant that the defendant (1) was traveling alone under an alias, (2) had paid cash for a one-way train ticket, and (3) had reserved the largest private room on the train. *Id.* at 1528–30.

The Tenth Circuit later applied *Ward* in *United States v. Bloom,* and held that the agents lacked reasonable suspicion to seize the defendant, who was traveling by train. 975 F.2d 1447. In *Bloom,* the agents knew that the defendant: (1) was traveling alone under his real name, (2) had reserved a private train compartment, (3) had paid cash for a one-way ticket, (4) had kept his luggage, a type commonly used by drug traffickers, in his private compartment, (5) had asked a train attendant why the agent

13

was present on the train, and (6) appeared to the agent to be very nervous and somewhat excited. *Id.* at 1458. The Court held that these factors were even less supportive of a finding of reasonable suspicion than those in *Ward. Id.* at 1458.

Similarly, in *United States v. Hall*, 978 F.2d 616, 621 (10th Cir.1992), the Court concluded the seizure of Ms. Hall and her luggage was not supported by reasonable suspicion when the only information known to the agents was the defendant boarded a train in Flagstaff, Arizona, rather than her hometown of Reno, Nevada; was traveling under her real name; was traveling alone in a private compartment; had paid cash for a one-way ticket; had provided a callback number of a California travel agency; was traveling with a very heavy suitcase; and appeared nervous when approached by the agents. *Id.*

Here, the only information Agent Perry had before he re-approached Ms. Stewart, detained her and subjected her to questioning, without consent, was that she was traveling one-way from Chicago to Los Angeles, had purchased her ticket under her name, at the Chicago Amtrak train station the day before her travel, was traveling in a private sleeper room and appeared nervous to the agent. These facts do not give rise to reasonable suspicion to seize Ms. Stewart during the second encounter, subject her to questioning and a search of her third piece of luggage. Accordingly, all the evidence derived as a result of Ms. Stewart's unlawful detention and seizure must be suppressed.

Counsel for the government opposes the instant motion to suppress evidence.

Wherefore, for the foregoing reasons, Ms. Stewart respectfully requests this Court suppress all evidence seized from Ms. Stewart on February 5, 2018, as violative of the Fourth Amendment to the United States Constitution.

        Respectfully Submitted,

        <u>electronically filed 12/22/18</u>
        Erlinda O. Johnson
        Counsel for Heather Stewart
        620 Roma Ave. N.W.
        Albuquerque, NM 87102
        (505) 792-4048
        erlinda@erlindajohnsonlaw.com

I hereby certify that a true and correct Copy of the foregoing was provided To AUSA Kotz, on this 22nd Day of December, 2018 via electronic means, CM-ECF.

    /s/
Erlinda O. Johnson
Attorney at Law